UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BRIDGETT G.,

                Plaintiff,

       v.                                    **DECISION AND ORDER**
                                                         20-CV-826S
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____

        1.        Plaintiff Bridgett G.[1] brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security that denied her application for supplemental security income under Title XVI of the Act. (Docket No. 1.) The Court has jurisdiction over this action under 42 U.S.C. § 405(g).

        2.        Plaintiff filed her application with the Social Security Administration on July 15, 2016. (R.[2] at 81.) Plaintiff alleged disability due to depression, anxiety, and lower back pain, lumbar region. (R. at 178.) Plaintiff's application was denied, and Plaintiff thereafter requested a hearing before an administrative law judge ("ALJ"). On February 7, 2019, ALJ Timothy Belford held a hearing, at which Plaintiff, represented by her attorney, appeared and testified. (R. at 35-64.) Vocational Expert Elaine Cogliano also appeared and testified by telephone. At the time of the hearing, Plaintiff was 44 years old, with a

---

[1] In accordance with this Court's Standing Order of November 18, 2020, and consistent with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, this Decision and Order will identify Plaintiff by his first name and last initial.

[2] Citations to the underlying administrative record are designated as "R."

twelfth-grade equivalent education and prior work experience as a cleaner, fast food worker, and general laborer. (R. at 179.)

3. The ALJ considered the case *de novo* and, on April 1, 2019, issued a written decision denying Plaintiff's application for benefits. (R. at 18-28.) On May 6, 2020, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (R. at 1.) Plaintiff then filed the current action on July 2, 2020, challenging the Commissioner's final decision.[3]

4. Both parties moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. (Docket Nos. 11, 15.) Plaintiff filed her reply on August 15, 2021 (Docket No. 16), and this Court took the motions under advisement without oral argument. For the reasons that follow, Plaintiff's motion is granted, and Defendant's motion is denied.

5. A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). Substantial evidence is that which amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the

---

[3] The ALJ's April 1, 2019, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

6. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference and will not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

7. The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled under the Act.  See 20 C.F.R. §§ 404.1520, 416.920.  The Supreme Court of the United States recognized the validity of this analysis in Bowen v. Yuckert, and it remains the proper approach for analyzing whether a claimant is disabled.  482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987).

8. The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or

3

>mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (quotations in original); see also 20 C.F.R. § 416.920; Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

9. Although the claimant has the burden of proof on the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984). The final step is divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.920(a)(4); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

10. The ALJ analyzed Plaintiff's claim for benefits under the process set forth above. At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her application date of July 15, 2016. (R. at 20.) At step two, the ALJ found that Plaintiff has the severe impairments of affective disorder, anxiety disorder, post-

4

traumatic stress disorder, borderline personality disorder, degenerative disc disease of the lumbar and cervical spine, bilateral hip disorder, and obesity. (Id.) At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any impairment(s) listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (Id.)

11. Next, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform light work, except that she could do

> no more than occasional stooping, crawling, kneeling, crouching, or climbing of ramps, stairs or ladders. [She] is limited to frequent balancing and would need to avoid more than occasional exposure to unprotected heights or close proximity to hazardous moving machinery. Mentally, the claimant is limited to simple, routine tasks with only occasional decision-making and occasional changes in the workplace. [She] is limited to occasional interaction with co-workers and supervisors and no interaction with the public.

(R. at 23.)

12. At step four, the ALJ found that Plaintiff has no past relevant work. (R. at 27.) At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Id.) Accordingly, the ALJ found that Plaintiff is not disabled. (R. at 28.)

13. Plaintiff argues that the ALJ failed to apply the correct legal standards to the opinion of Plaintiff's treating physician, Dr. Jeremy Riedesel, and failed to account for Plaintiff's limited ability to deal with stress. Plaintiff also argues that the Appeals Council improperly rejected opinions by Dr. Riedesel and Social Worker Joyce Towers that Plaintiff submitted after the ALJ's decision. Defendant argues that the ALJ's decision is supported by substantial evidence.

14. For claims filed before March 27, 2017, such as this one, the Commissioner evaluates medical opinion evidence under the framework set forth in 20 C.F.R. § 404.1527.[4] Under that framework, the Commissioner is required to evaluate and consider every medical opinion submitted, together with the rest of the relevant evidence. See 20 C.F.R. § 404.1527 (b) and (c). The opinion of a treating physician is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c).

15. If a treating physician's opinion is not given controlling weight, the Commissioner must consider the following, nonexclusive, factors: "[l]ength of the treatment relationship and the frequency of examination"; the "[n]ature and extent of the treatment relationship"; the "relevant evidence ..., particularly medical signs and laboratory findings," supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)). "Generally, the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." Id. (citing 20 C.F.R. § 404.1527(d)(2)(i)).

16. After considering these factors, the Commissioner must adequately explain the weight afforded to the medical opinions, including those that do not receive controlling

---

[4] For claims filed on or after March 27, 2017, the Commissioner evaluates medical evidence under 20 C.F.R. § 404.1520c.

6

weight. See Falbru v. Berryhill, No. 6:17-CV-6314 (MAT), 2018 WL 1553965, at *2 (W.D.N.Y. Mar. 30, 2018) ("Remand is appropriate where an ALJ fails to consider these factors and to adequately explain the weight given to the consultative examiner's opinion."); Hatcher v. Astrue, 802 F. Supp. 2d 472, 476 (W.D.N.Y. 2011) ("The ALJ must then articulate his reasons for assigning the weight that he does to both treating and nontreating physicians' opinions."). Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Burgess v. Astrue, 537 F.3d 117, 129–30 (2d Cir. 2008) (quoting Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999)). However, an ALJ's failure to consider the above factors can be harmless error, if "a searching review of the record" assures a court that "the substance of the treating physician rule was not traversed." Estrella v. Berryhill, 925 F.3d 90, 93 (2d Cir. 2019).

17.   Plaintiff was seen by Dr. Jeremy Riedesel during the relevant period between 2016 and 2018. On July 7, 2016, several months after her discharge from the hospital for an acute psychotic episode, Dr. Riedesel saw her for new patient intake. Plaintiff was complaining of back pain and he examined her for that complaint. He observed that her speech was rushed but her mood stable, and that she was asking to change her mental health medications. (R. at 421.)  On August 26, 2016, Dr. Riedesel saw Plaintiff again. He reported that she was stopping Latuda, one of her mental health medications, and she complained of back pain. (R. at 424-425.) Dr. Riedesel requested imaging of Plaintiff's back.

18.   On October 26, 2016, Dr. Riedesel observed that Plaintiff was "fixated and impossible to redirect." In his office note, written during or after the visit, Dr. Riedesel wrote "my opinion of her physical limitations hasn't changed, but now I feel she has many

mental limitations to being able to work. She has extreme difficulty following instructions. She becomes fixated on her beliefs and topic of conversation and it is very difficult, near impossible to redirect her. She has many fears which prevent her from performing basic tasks or participating in conservative treatments such as physical therapy." (R. at 632.) On December 13, 2016, Plaintiff saw Dr. Riedesel again and discussed an assault by a chiropractor in the past, something she blamed for both her physical and mental symptoms. She displayed hypomania and flight of ideas. She had stopped her medications. (R. at 622-24.)

19. On September 14, 2017, Plaintiff saw Dr. Riedesel again for follow up on her neck, back, and hip pain. Dr. Riedesel noted that plaintiff was distrustful during the encounter. (R. at 597.) When Dr. Riedesel discussed her essentially normal MRI results, she became upset, discussing her mistreatment by the chiropractor years ago. (R. at 598.) Dr. Riedesel diagnosed her with paranoid personality disorder due to her inability to believe any report that did not agree with her personal beliefs about the cause of her symptoms. (R. at 599.)

20. On August 28, 2018, Dr. Riedesel completed a DSS employability assessment. (R. at 787-87.) He opined that Plaintiff was moderately limited in her ability to carry out instructions, maintain attention, make simple decisions, interact appropriately with others, and maintain socially appropriate behavior. (R. at 787.) He opined that she was extremely limited in her ability to "function in a work setting at a consistent pace." (Id.) In comments, he noted that any personal or social interaction caused extreme distress. (Id.)

21. On September 18, 2019, Dr. Riedesel completed a "physician verification form" for a county child support enforcement unit, in which he opined that Plaintiff was unable to work due to her mental health issues. (R. at 790.)

22. The ALJ gave Dr. Riedesel's opinion regarding Plaintiff's inability to work and her difficulty with personal and social interactions little weight because it was conclusory and lacked support in the record. (R. at 26.) He explained that "Dr. Reidesel (sic) is not a mental health professional, is not familiar with the rules and regulations of the disability program and he did not adequately consider the totality of evidence in addressing the alleged functional limitations." (Id.) In particular, the ALJ noted that Plaintiff could interact cooperatively with others on an individual basis, had some good friends, goes out to eat occasionally, and had "good function when compliant with medication." (R. at 26.) The ALJ also found that Dr. Riedesel's descriptions of "distrustfulness, hypomania, flight of ideas and tangential thinking" were not consistent with the rest of the record. (R. at 24.)

23. As an initial matter, whether a treating physician has *considered* "the totality of the evidence" is not a factor in determining the weight to give his or her opinion. While the ALJ did mention some valid reasons for giving Dr. Riedesel's opinion less weight— his lack of specialization in mental health and his possible lack of familiarity with disability regulations—the ALJ failed to consider other regulatory factors, particularly the length and nature of the treating relationship.

24. Additionally, this Court finds that the ALJ's opinion that Dr. Riedesel's opinion was not consistent with the record as a whole is not supported by substantial evidence. The record shows that Plaintiff experienced persistent mental health issues that

9

limited her functioning, particularly her ability to interact with care providers and make decisions. In January 2016, before her application date, Plaintiff was brought to the hospital by the Jamestown Police Department and hospitalized for uncontrolled depression with psychotic features. (R. at 238.) One of her main persistent complaints was that wherever she lived, her neighbors would bang on her floors and ceiling to disrupt her. She told providers at the hospital that people had followed her from Kentucky to Jamestown. (R. at 242.) At the same time, she expressed uncertainty about taking medication. (Id.) On February 4, 2016, while still hospitalized, her diagnosis was adjusted to schizoaffective disorder, bipolar type. (R. at 254.)

25. On February 16, 2016, the Jamestown Police Department again brought Plaintiff to the hospital. She was complaining that neighbors were causing pulsations that were hurting her, and that she wanted to hurt herself. (R. at 303.) She expressed delusions regarding harm by prior health care providers under "Obamacare." (R. at 340-41.) She was hospitalized until February 29, 2016. (R. at 313.) Again, she expressed concerns about her medication. (R. at 348.)

26. In May and June of 2016, Plaintiff was complaining to health care providers about neighbors knocking on her walls, poking her through her walls, and sending waves or vibrations through her walls to hurt her. She preferred sleeping in her van where the "evil people" could not harm her. (See, e.g., R. at 543, 545.) At the same time, Plaintiff asked her mental health treatment providers if she could stop her mental health medications and her doctors were discouraging this course of action. (R. at 545.)

27. On June 6, 2016, Roseann Flick, her mental health nurse practitioner, noted that Plaintiff was adamant about discontinuing her medications, and that "she shows no

correlation between the fact that she is taking medication and she is stable at this time, and she states that she finds it puzzling as to why Dr. McMahon and this writer feel that the medication has been helpful when it is all really her will power that is helping her to succeed and be stable." (R. at 551.)  On June 20, 2016, Plaintiff told her counselor that she understood that people cannot actually poke her through the floor but felt that they were intentionally making loud noises to agitate her. (R. at 554.) On July 25, 2016, Plaintiff expressed a wish to stop her medication, and continued to report that "at no time was she delusional or psychotic but rather she was, per her report, a victim of harassment." (R. at 561.) On August 9, 2016, Plaintiff was seeking to discontinue not just medications but group therapy, and stated she would seek psychiatric services from another provider. (R. at 566.) On August 15, 2016, Plaintiff had seemingly discontinued her mood stabilizers, spoke with pressured speech and frequent repetitions, was circumstantial and tangential. (R. at 568-69.) She stated that all improvements were due to her will and drive. (Id.) At a psychiatric visit on September 19, 2016, Plaintiff stated that any mental problems she had were the result of past abuse by a chiropractor. (R. at 575.) Plaintiff perseverated and contradicted herself frequently. (Id.)

      28.    On October 14, 2016, consulting psychiatrist Dr. Kristina Luna found that Plaintiff was moderately limited in making appropriate decisions, relating with others, and appropriately dealing with stress. (R. at 487.) Dr. Luna noted that Plaintiff's thought process was irrelevant and circumstantial, her mood was dysthemic and overwhelmed, and her attention was mildly impaired due to emotional distress. (Id.) As part of her consultative opinion, Dr. Luna referred Plaintiff for psychiatric intervention. (Id.)

29. On February 28, 2017, Physician's Assistant Kate Wiggers noted that Plaintiff displayed distrustfulness and hypomania during an office visit. (R. at 610.) Plaintiff's speech showed flight of ideas and tangential thinking. (Id.) PA Wiggers stated that she "spent excessive time on discussion" of Plaintiff's MRI and that Plaintiff was not interested in any options Wiggers offered her. (R. at 611.)

30. On September 14, 2017, Dr. Riedesel found her distrustful and irritable, and diagnosed her with paranoid personality disorder. He attempted to explain to Plaintiff that MRI findings showed no hip and back issues, and she became distraught. (R. at 598.) He noted that she "appears not to trust or believe any report that does not agree with her personal beliefs about the cause of her symptoms." (R. at 599.)

31. During 2018, notes from Social Worker Joyce Towers reveal that Plaintiff was again complaining that her neighbors were "poking at her," that "evil people" had followed her for the past 4 years, and that she was not interested in taking medication. (R at 726, 751.)

32. The Commissioner points to numerous office notes stating that Plaintiff was alert, well groomed, and had "normal mental status examinations." (Docket No. 15-1 at p. 20, citing, e.g., R. at 612-68.) Yet in the pages the Commissioner points to, Plaintiff reported being distressed by intrusive thoughts and delusions, experienced anxiety, was fixated on past trauma, had trouble maintaining housing due to her fears, and was irritable and noncompliant with her treatment providers. The ALJ found that Plaintiff's ability to have a few friends and go out to eat occasionally was evidence that Plaintiff could interact with others, but he failed to address the copious evidence of her difficulty interacting with, and listening to the opinions of, her own care providers.

33.     Dr. Riedesel's opinion that Plaintiff was moderately limited in her ability to carry out instructions, maintain attention, make simple decisions, interact appropriately with others, and maintain socially appropriate behavior appears to be consistent both with his clinical observations of Plaintiff, and with the rest of the record. His opinion that personal and social interactions caused distress is supported by his own and other providers' clinical observations and interactions with Plaintiff. The Commissioner cites Halloran v. Barnhart for the proposition that an ALJ demonstrates a good reason for assigning a treating source little weight where the assessment is not supported by the source's own treatment notes and inconsistent with other medical evidence in the record. 362 F.3d 28, 31 (2d Cir. 2004). But here, Dr. Riedesel's assessments are supported by his treatment notes and are consistent with other observations in the record.

34.     Finally, the ALJ's finding that Plaintiff had good functioning when compliant with medication fails to recognize that her noncompliance with medication may well have been a manifestation of her mental illness. "Federal courts have recognized that failure to comply with treatment can be a direct result of bipolar disorder." Jimmeson v. Berryhill, 243 F. Supp. 3d 384, 391 (W.D.N.Y. 2017) (citing Kangail v. Barnhart, 454 F.3d 627, 630-31 (7th Cir. 2006)).

35.     This Court finds that the ALJ did not give good reasons for the weight he gave to Dr. Riedesel's opinions and that Dr. Riedesel's opinions are consistent with the totality of the evidence. For these reasons, this Court finds that the ALJ's opinion is not supported by substantial evidence.

36.     Plaintiff also argues that the ALJ did not properly assess the opinion of Dr. Kristina Luna regarding Plaintiff's ability to handle stress and that the Appeals Council

13

wrongly declined to consider two additional opinions submitted after the ALJ's decision. This Court offers no opinion on these arguments at this time since the case is being remanded on other grounds. On remand, the ALJ is free to address these arguments to the extent he deems necessary.

37. After carefully examining the administrative record, this Court finds cause to remand this case to the Commissioner for further administrative proceedings consistent with this decision. Plaintiff's motion for judgment on the pleadings is therefore granted. Defendant's motion seeking the same relief is denied.

IT HEREBY IS ORDERED, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 11) is GRANTED.

FURTHER, that Defendant's Motion for Judgment on the Pleadings (Docket No. 15) is DENIED.

FURTHER, that this case is REMANDED to the Commissioner of Social Security for further proceedings consistent with this decision.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

Dated: November 29, 2021
           Buffalo, New York

                                                                      s/William M. Skretny
                                                                       WILLIAM M. SKRETNY
                                                              United States District Judge